## University of Mississippi *v.* Deister.

[76 South. 526, Division A.]

1. COLLEGES AND UNIVERSITIES. *Professors. Contracts.*
   Under the facts set out in its opinion the court held that the letter and telegram mentioned therein and upon which suit was based did not constitute a written contract between the appellant and the appellee as to the number of years appellee was to serve or as to what his salary was to be or would be as a full professor.

2. COLLEGES AND UNIVERSITIES. *Professors. Contract. Dismissal.*
   After the passage of the order by the board of trustees as set out in the opinion of the court, plaintiff's employment was subject to such order of the board, which became a part of his contract and thereunder the board of trustees had a right at their pleasure to dismiss him from his professorship.

APPEAL from the circuit court of LaFayette county.
Hon. J. L. BATES, Judge.

Suit by J. L. Deister against the University of Mississippi. From a judgment for plaintiff, defendant appeals.

The facts are fully stated in the opinion of the court.

*Edgar Webster,* for appellant.

*W. E. Stone* and *L. C. Andrews,* for appellee.

SYKES, J., Delivered the opinion of the court.

The appellee and cross-appellant, plaintiff in the court below, filed suit in the circuit court of Lafayette county against the University of Mississippi for a part of four years' salary alleged to be due him under his contract with the chancellor of the University, for services as a full professor of Romance languages. The lower court

peremptorilly instructed the jury to return a verdict in. favor of the plaintiff for five hundred and twenty-five dollars as salary due him for the months of June, July, August, and half of September, 1913, at the rate of one hundred and fifty dollars per month. From this judgment the University of Mississippi prosecutes an appeal, and Dr. Deister a cross-appeal.

It is claimed by the appellee and cross-appellant that there was a written contract entered into between the University and Dr. Deister, based upon a letter from Dr. Brown, a professor of the University, written to Dr. Deister, reading as follows:

"University of Mississippi.
"Graduate Committee                    University of Miss.
"Calvin S. Brown, Chairman. August 8, 1908.

"Mr. John L. Deister, Parkville, Mo.—Dear Sir: Dr. Weeks has sent me your name. There is an instructorship in this University in Modern Languages for next year at one thousand dollars; the second year it should be an assistant professorship at one thousand and five hundred dollars; and the third a full professorship at two thousand dollars, if the man proves to be the right man. By the resignation of one of our professors, I am called upon to act as head of both the Romanic and the German departments; naturally I shall wish to be rid of one as quickly as possible. The new instructor will be called upon to teach both French and German; possibly Spanish, too, under my direction.

"Are you in a position to accept this instructorship, if it should be offered to you? Which of these languages do you speak? Which is your native tongue? What is your age? Are you married?

"Very truly,                    Calvin S. Brown"

—and a telegram sent by Chancellor Kincannon the then chancellor of the University, to Dr. Deister, reading as follows:

"8/21/1908.    Received at 2 p. m. Dated, Oxford, Miss. To Prof. J. L. Deister, R. F. D. 3, Parkville, Mo.

I hereby tender you Assistant Professorship Modern Languages Miss—University, salary thousand dollars per annum. Professorship Romanic Languages probably year hence. Wire answer. A. A. Kincannon."

In response to the letter above quoted, Dr. Deister made a trip to the University of Mississippi and discussed with Dr. Brown and Chancellor Kincannon the duties of the office. Shortly after returning to his home in Missouri he received the telegram from Chancellor Kincannon. He accepted the position tendered him in the telegram, served the first year as assistant professor of modern languages, and was paid for his services in accordance with the telegram. The next scholastic year at the University, which began in September, 1909, he was promoted to a full professorship, and was thereafter paid during the balance of the time he was at the University at the rate of one thousand and eight hundred dollars a year—or one thousand and five hundred dollars a year and was given three hundred dollars for commutation money. Commutation money is allowed professors when they are not furnished with residences by the University. This amount of one thousand and eight hundred dollars a year is paid in twelve monthly installments of one hundred and fifty dollars at the end of each month.

The testimony in the case is practically uncontradicted, and we shall consider that of Dr. Deister himself. This witness testified that at the end of his first year's service he was made a full professor, but that the chancellor told him that owing to the fact that there was a shortage of funds, and that the University was in debt, and there

were other men making claims, that he could not pay him the full salary of two thousand dollars, but that he agreed to pay him one thousand and five hundred dollars and three hundred dollars for his rent. That for the next scholastic year, beginning September, 1910, and ending September, 1911, the chancellor again made the same excuse as above set out, and held out the hope that the following year, after the meeting of the legislature, he would be able to pay him a full salary of two thousand dollars. In response to a question of his attorney as to whether or not he consented to work for the year 1910-11 for one thousand and eight hundred dollars, he answered, "Yes, I went ahead and worked for that salary," for which work he was paid. For the scholastic year 1911-12, he states he talked with the chancellor several times about this salary, but could not get any definite answer from him. That summer he went to Europe, and on his return he had another talk with the chancellor along the same lines, and was told that the chancellor had recommended the increase in salary, but the board of trustees had declined to give it to him. With this information he worked that year for the salary of one thousand and eight hundred dollars, which was paid him. He states that he did not accept it in full settlement of his salary, but that he accepted the money. It is also shown in the record that some time in the year 1911 he took up with members of the board of trustees the question of raising his salary to two thousand dollars a year. He wrote letters to members of this board, and also wrote a letter to the Governor about the same matter in the year 1912. In other words he had ascertained some time in 1911 that the board of trustees were the final arbiters as to the amount of salary to be paid professors and instructors at the University. At the end of the scholastic year 1911-12, all of the professors were re-elected

for the ensuing scholastic year at the same salaries paid them the previous year, as is shown by the written proceedings of the board of trustees. In February, 1913, Dr. Deister wrote a letter to Chancellor Kincannon and the board of trustees, asking that he be granted the full salary of two thousand dollars a year with commutation. In this same letter he also asks for a year's leave of absence. He concluded the letter by stating that if the above requests were not granted, then he asked that his resignation be accepted to take effect at the end of that scholastic year, which was the 15th of September, 1913. In response to that letter his resignation was accepted by the board, to take effect on September 15th. After his resignation was accepted Dr. Deister became quite insistent that the chancellor and the board of trustees allow him the salary of two thousand dollars a year and three hundred dollars commutation money for the entire time he had been a full professor of the University. He had several conversations with individuals members of the board, and indicated to some of them that if this claim was not paid he would institute legal proceedings to collect this entire sum. At the meeting of the board of trustees, either the latter part of May or the 1st day of June, 1913, this board dismissed Dr. Deister from his professorship at the University. That scholastic year, for which all the professors had been chosen by this board, did not end until the middle of September.

Upon the objection of counsel for plaintiff, the defendant was not allowed to show the reasons why Dr. Deister was dismissed. An examination of the record, however, leads us to the inevitable conclusion that it was because the board thought he had been perniciously active and unduly annoying them with his many requests for a raise in salary. On March 27, 1912, the board of trustees adopted the following written by-law:

" Tenure of Service.

" The members of the faculty and all officers hereafter employed by any of the higher educational institutions of the state of Mississippi shall hold their respective positions during the pleasure of the board, and not otherwise; and it shall be the duty of the president of each of said institutions, of which he may be the head, to inform such one that his or her employment is subject to this condition in reference to its termination."

This was before the beginning of the last scholastic year during which Dr. Deister was with the University. The testimony of the plaintiff in the court below showed that the chancellor of the University read the above by-law to the professors during the year 1912.

The letter and telegram upon which this suit is based do not constitute a written contract between the appellant and the appellee, as is contented by the appellee. The letter is no part of a contract at all, but was merely a polite inquiry on the part of Dr. Brown as to whether or not the appellee could accept the position if tendered him, stating the probability of promotion and his idea of the salary appellee would get should he be selected for the position. The telegram from Chancellor Kincannon was merely an offer of the assistant professorship for one year at a salary of one thousand dollars a year. This contract was carried out. The latter part of the telegram states the probabilities of the promotion which may follow, but does not state the salary. If it did it would make no difference. The record also shows that appellee was employed from year to year by the board of trustees, upon the recommendation of the chancellor, and that he was informed by the chancellor of the salary he was to receive for this employment. It is true that he always contended that it was too small and that he should be paid a salary of two thousand dollars, as others, if not all, the profess ors in the University received. Though protesting, he

always accepted the position and cashed his monthly checks. The professors of the University were elected for each scholastic year by the board of trustees and their salaries were fixed by this board. The chancellor of the University usually made whatever recommendations he desired as to the amount of these salaries. Whether or not the appellee knew this the first year he was promoted to a full professorship makes no difference, for the reason that Chancellor Kincannon informed him what that salary would be. Having no other contract with the University, when he accepted the position, knowing what the salary would be, he necessarily agreed to accept that salary as full compensation. This fact is true for all the other years he remained there. The record, however, shows that he found out very soon that the salaries were fixed by the board of trustees, and he soon began to appear before the board and tried to get a raise in salary. It is quite significant that in the letters written to the members of the board, and in his statements before the board, his contention seems to have been always for a raise in salary and not an attempt on his part to collect any back salary. This was the situation untill after his resignation was accepted. After that time, however, he began, for the first time, to claim that the University owed him this back salary. There was no imposition whatever practiced upon the appellee, either by the chancellor or by the board of trustees. He was at all times fully informed as to what his salary would be, and this salary he received. We therefore conclude on this proposition that he had no written contract as to the term of years he was to serve at the University, or what his salary was to be or would be as a full professor. The learned trial judge was correct in not submitting this question to the jury.

On the question of direct appeal, the board of trustees was in full control and management of the University and its affairs. Subject to the laws of the state of Mississippi, it was entirely lawful for them to adopt the by-

law passed by them on March 27th to the effect that the tenure of offices of all professors and employees of the University of Mississippi would be at the will and pleasure of this board. Time and again he had read the minutes of the board and had also seen this order on the minutes. After this order was passed, viz. in September, 1912. he, along with all the other professors, was elected for the ensuing scholastic year by an order shown on the minutes of the board. This employment, therefore, was subject to the above order of the board, which by-law became a part of his contract, and under which the board of trustees had a perfect right at their will and pleasure to dissmiss him from services of this institution. It therefore follows that the lower court was in error in not granting the defendant the peremptory instruction asked by it, from which it follows that the case is reversed, and judgment will be entered here in favor of the defendant.

*Reversed.*